781 So.2d 1040 (2000)
Roger Lee CHERRY, Appellant,
v.
STATE of Florida, Appellee.
No. SC90511.
Supreme Court of Florida.
September 28, 2000.
Rehearing Denied March 27, 2001.
*1042 Gregory C. Smith, Capital Collateral Counsel, Andrew Thomas, Chief Assistant CCRC, and Sylvia W. Smith, Assistant CCRC, Office of the Capital Collateral Counsel-Northern Region, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
Roger Lee Cherry appeals an order entered by the trial court below pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For reasons which follow, we affirm the trial court's order denying Cherry's postconviction motion.
Appellant was convicted of two counts of first-degree murder, one count of burglary with assault, and one count of grand theft and was sentenced to death for the 1986 slaying of an elderly couple in Deland, *1043 Florida. The facts in this case are set forth in greater detail in our opinion on direct appeal, in which we affirmed Cherry's convictions. See Cherry v. State, 544 So.2d 184 (Fla.1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 963 (1990).
Briefly, Cherry had burglarized the home of Esther and Leonard Wayne, during which burglary Esther Wayne was killed by multiple blows to the head and Leonard Wayne died from cardiac arrest. The jury recommended death for both murders. The trial court followed the jury's recommendation, finding four aggravating factors for each victim: (1) Cherry had been previously convicted of a felony involving the use and threat of violence (i.e., robbery); (2) the murders were committed while Cherry was engaged in a burglary; (3) the murders were committed for pecuniary gain; and (4) the murders were "especially wicked, evil, atrocious, or cruel."
On appeal we held the aggravators for murder committed while engaged in a burglary and murder committed for pecuniary gain should have been considered as a single aggravating factor because they were based on the same aspect of the crime. We found that the heinous, atrocious, or cruel (HAC) aggravator was appropriate to the death of Esther Wayne but not as to Leonard Wayne. We then found the sentence of death proportionate as to the murder of Esther Wayne but not as to the death of Leonard Wayne. We stated:
Second, Cherry contends that the circumstances of this case do not support the trial court's finding that the murders were "especially wicked, evil, atrocious or cruel." We disagree and find that, as to Mrs. Wayne, the state has demonstrated the existence of this aggravating factor beyond a reasonable doubt.
. . . .
The testimony of the district medical examiner indicates that Mrs. Wayne was literally beaten to death. The medical examiner's external observations of Mrs. Wayne revealed multiple areas of contusion around the neck, eyes, lip, the right shoulder and collarbone, and over the left collarbone. A subdural hemorrhage covered most of the brain and was attributed to a forceful blow to the head. The left temporal bone was fractured and the skull dislocated from the spine at its juncture. Those injuries were consistent with trauma caused by her being struck with a fist, hand, or blunt instrument and resulted from at least five blows.
In addition, there was a shoe print on the back of Mrs. Wayne's pajama bottom with a corresponding bruise on her right buttock. The medical examiner concluded that the injuries received by Mrs. Wayne were severe and must have been inflicted with great force. Under these circumstances, the aggravating factor of heinous, atrocious, or cruel is appropriate to the murder of Mrs. Wayne. However, we find this aggravating factor inapplicable to the murder of Mr. Wayne.
Although we have concluded that there was an improper doubling, we are still left with three aggravating factors as to Mrs. Wayne-prior conviction of a violent felony, murder committed for pecuniary gain, and that the murder was especially heinous, atrocious, or cruel. In the absence of any mitigating factors, under these circumstances we affirm the death penalty as to Mrs. Wayne. However, we reverse the death sentence imposed as to Mr. Wayne on the ground that it is disproportionate as applied. We cannot conclude that death is a proportionate punishment when the victim *1044 dies of a heart attack during a felony in the absence of any deliberate attempt to cause the heart attack.
Id. at 187-88 (footnote omitted).
Cherry subsequently filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The trial court summarily denied the motion without holding an evidentiary hearing on the ground that most of the claims could have been raised on direct appeal. As for Cherry's remaining claim concerning ineffective assistance of counsel, the trial court denied the motion because Cherry failed to satisfy the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On appeal, we affirmed the summary denials of all claims except those claims alleging counsel was ineffective in the penalty phase of the trial. We remanded for an evidentiary hearing on those claims. See Cherry v. State, 659 So.2d 1069 (Fla.1995).
Upon remand, the trial court held a three-day evidentiary hearing. Following the presentation of evidence and arguments by counsel, the trial court denied relief. The trial court entered an extensive, detailed order setting forth her reasons for the denial of relief.
This appeal follows, in which Cherry raises four issues for our review: (1) whether the trial court erred in denying Cherry's claim for ineffective assistance of penalty-phase counsel; (2) whether the trial court erred in denying Cherry's claim that he was denied a competent mental health evaluation and that counsel was ineffective for failing to provide the expert with sufficient background information; (3) whether trial counsel rendered ineffective assistance of counsel by failing to object to unconstitutional jury instructions and improper prosecutorial comments; and (4) whether the trial court erred in denying Cherry's motion to perpetuate testimony of out-of-state expert witnesses. For reasons stated below, we affirm the trial court.
In her order, the trial judge concluded:
The Court finds that in regard to Defendant's ineffective assistance claim alleging that counsel was deficient for not presenting the mental retardation mitigator and the organic brain damage mitigator, the Doctor's conclusions that the Defendant has fetal alcohol syndrome, organic brain damage and mental retardation were not supported at the evidentiary hearing with more than speculation that the Defendant's mother drank while she was pregnant with the Defendant, that he was exposed to agricultural toxins and as a result of these conditions, the Defendant suffers from organic brain damage. As such, Dr. Crown's testimony that the Defendant suffers from organic brain damage was derived from the accounts of his mother's alcohol abuse, the Defendant's mistreatment as a child, and the geographical and economic background of the Defendant during his childhood. Dr. Crown testified at the evidentiary hearing that his conclusion that the Defendant suffers from organic brain damage and mental retardation was not derived from any physical test results of the Defendant.
Moreover, at trial counsel requested psychiatric assistance and Dr. Barnard was appointed. Dr. Barnard testified at the evidentiary hearing held on December 16, 1996, that at the time of trial and at the evidentiary hearing, the Defendant fit the criteria for having an "antisocial personality disorder." Further, the doctor testified that in order to be found retarded, an individual must score seventy (70) or below. As such, the Defendant scored a 71 on verbal and a 76 on performance which gave him a resulting score of 72 which indicates a *1045 "borderline retardation" rather than retardation.
Furthermore, in response to the other possible mitigators referenced by the Defendant in his Motion, the Court finds that Dr. Barnard's evaluation/examination was introduced into evidence at the penalty phase at which time it was considered by the jury panel. In the evaluation by Dr. Barnard of the Defendant, Dr. Barnard summarized the Defendant's background from self-accounts of the Defendant as well as other materials provided by trial counsel (Mr. Miller). The information Dr. Barnard relied on included the Defendant's family history, educational history, employment history, marital history, medical history, psychiatric history and alcohol and drug history. See Psychiatric Evaluation of Roger Lee Cherry by Dr. George Barnard, attached hereto as Appendix A. This report came in as evidence at penalty phase without objection by the State, thereby, eliminating cross-examination of the facts presented in the report.
Further, in opposition to Dr. Crown's mental analysis of the Defendant that he does not fit the criteria for anti-social disorder, that he suffers from organic brain damage; and, that he suffers from mental retardation, Dr. Barnard, who evaluated the Defendant in 1986, testified that the Defendant does not exhibit any evidence of organic brain damage and that even if he did, that did not preclude the presence of "anti-social disorder" according to leading treatises. Dr. Barnard testified that the only evidence he had which may have supported a finding of brain damage was the fact that the Defendant had been hit in the mouth with a hammer at the age of 13; however, Dr. Barnard's evaluation report of the Defendant demonstrates that even considering the hammer incident, he still concluded that:
"[T]he defendant is a man who appears his stated age. He is oriented for person, time, place and situation, except that he is one day off for the day of the month. Clinically, he is judged to be of average intelligence. His recent and remote memory are intact, other than for mild deficits. He has no indication of thought disorder, and specifically no loosening of associations, delusions, or flight of ideas. He is able to abstract 2 out of 5 proverbs. His affect is appropriate and there is no sign of undue anxiety or depression.... It is my medical opinion that the defendant is competent to stand trial, does not meet the criteria for involuntary hospitalization, and at the time of the alleged crimes would have known the nature and quality of his acts and the wrongfulness of them." See Report of Dr. Barnard, at pages 3, 4 attached hereto as Appendix A.
Dr. Barnard further testified that in 1996, upon re-evaluation, even with further background information on the Defendant, he still maintains that the Defendant is not mentally retarded but according to IQ testing is "borderline," suffers from "anti-social disorder" and there are not statutory mitigating circumstances in this case. Additionally, Dr. Barnard testified that he relied on affidavits of background witnesses for his 1996 re-evaluation of the Defendant, and even considering these new affidavits, Dr. Barnard found the Defendant to be clinically of average mental capacity and to suffer from "anti-social disorder." Dr. Barnard testified at the evidentiary hearing and in his deposition that upon re-evaluation although he continued to find no statutory mitigators he would now find non-statutory mitigators of child-abuse, intoxication *1046 and drug use at the time of the offense. See Deposition of Dr. George Barnard attached hereto as Appendix B. The Court finds that because Dr. Barnard's report, which was entered into evidence summarized the Defendant's child abuse, the jury did consider it in mitigation. The Court further finds that the nonstatutory mitigators of alcohol and drug use at the time of the offense are refuted by the Defendant's own testimony and the circumstances of the crime, therefore, such mitigators would have been inconsistent with the Defendant's testimony and counsel could not be expected to present mitigators which contradict the evidence and testimony of the Defendant.
Alternately, because the Defendant continued to profess his innocence to Dr. Barnard during his evaluation, to defense counsel throughout his representation of the Defendant, and throughout his testimony at trial, the Court finds that counsel was not ineffective for failing to more fully present mitigating evidence at penalty phase. Trial Counsel (Miller) testified at the evidentiary hearing held on December 16, 1996, that he did in fact discuss the possibility of a death sentence with the Defendant, but, the Defendant remained adamant that he was not near the home of the victims at the time of the offenses and did not commit them. Counsel further testified that even in light of his discussions regarding the possibility of a death sentence, the Defendant continued to refuse to communicate or to provide names of possible witnesses for mitigation. Trial counsel further testified that he asked the Defendant about teachers, neighbors, etc. for background information and the Defendant refused to divulge any witnesses who would have provided that information. Compare Rose v. State, 617 So.2d 291 (Fla. 1993) (Defense counsel was not ineffective for failing to more fully present mitigating evidence during penalty phase of capital murder prosecution; defendant had insisted on defense of innocence at trial, refusing to allow counsel to pursue other defenses such as insanity or intoxication, and counsel's decisions with respect to presentation of mitigating evidence at penalty phase were reasonable technical decisions given limitations imposed by defendant).
Accordingly, because the Defendant has failed to present evidence beyond speculation that demonstrates that Defendant suffered from mental retardation and organic brain damage, trial counsel cannot be said to be deficient for failing to present these conditions as viable mitigators at penalty phase. Furthermore, because the report of Dr. Barnard which summarized and contemplated the Defendant's background, mental history and alcohol & drug history was entered into evidence at penalty phase and thus was considered by the jury in their recommendation, the affidavits and witnesses presented at the evidentiary hearing are merely cumulative and do nothing more than bolster the information that was already presented by Dr. Barnard in his mental health evaluation report which was entered into evidence at penalty phase and was considered by the jury. Also, considering the Defendant's continued reliance on an innocence defense and in light of Defendant's refusal to communicate with trial counsel at penalty phase, the Defendant fails to establish that trial counsel was ineffective for not presenting additional mitigation beyond that summarized in Dr. Barnard's report.
2. Claim III alleges that the Defendant was denied a competent health examination and counsel was ineffective *1047 for failing to investigate and provide the mental health evaluator with background information on the Defendant and additionally was deficient for failing to arrange for an organic brain damage evaluation. This claim also asserts that trial counsel did move to retain a psychiatrist for a confidential evaluation of the Defendant to develop potential mitigation for use at penalty phase and the trial court upon appointing a psychiatrist improperly limited the scope of the examination to a determination of competence and sanity. Defendant contends that had he been afforded the assistance of a competent mental health expert at jury sentencing, it is highly likely that the jury would have recommended a life sentence.
Because the Defendant failed to present evidence beyond speculation supporting mitigating circumstances of organic brain damage and mental retardation, trial counsel cannot be deficient for not presenting evidence of such conditions. Moreover, the claim of incompetent mental health evaluation is procedurally barred for failure to raise it on direct appeal. Johnson v. State, 593 So.2d 206 (Fla.1992) (Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack on motion for postconviction relief); Medina v. State, 573 So.2d 293 (Fla.1990) (Postconviction proceedings are not to be used as second appeal); Doyle v. State, 526 So.2d 909 (Fla. 1988). As for the Defendant's argument that the Court improperly limited the scope of the Defendant's mental health examination, it is likewise without merit, as there is no specific provision authorizing the appointment of an expert to develop mitigating evidence. Rule 3.211, 3.216, Fla. R.Crim. P. (1996).
Defendant's further assertion that counsel did not request assistance to develop mitigating circumstances is refuted by the record which shows that counsel did consult with Dr. Barnard and introduced the Doctor's evaluation of the Defendant at penalty phase for its mitigating value. The Defendant's assertion that counsel was ineffective for failing to provide materials to Dr. Barnard for evaluation, also fails to establish grounds for relief. The background materials referred to by the Defendant in his Motion for Postconviction Relief were given to the Doctor by the Defendant through self-report. See psychiatric Evaluation of Roger Lee Cherry by Dr. George Barnard, attached hereto as Appendix A.
Finally, claims of intoxication at the time of the offenses are refuted by the record of Defendant's own testimony and the circumstances of the crime. See White v. State, 559 So.2d 1097 (Fla.1990) (evidence did not support determination that defense counsel was intoxicated during murder trial, in proceeding on petition for postconviction relief based upon alleged ineffective assistance of counsel). In the instant case, the Defendant was convicted of felony murder, he told Lorraine he was going out to get money, and Defendant's theory of defense was that he was somewhere else at the time the offenses were committed, therefore, he was innocent. As such, the theory of innocence is inconsistent with a defense of voluntary intoxication or drug use at the time of the offenses, therefore, the Defendant has failed to show deficient performance or prejudice for failing to present substance abuse in mitigation. See Testimony of Defendant attached hereto as Appendix C.
State v. Cherry, No. 86-4473, order at 3-9 (Fla. 7th Cir. Ct. order filed June 26, 1996) (footnotes omitted.)
*1048 As we recently pointed out in Stephens v. State, 748 So.2d 1028 (Fla.1999), in respect to claims of ineffective assistance of counsel, we defer to the trial court in respect to findings of fact, and we review the prongs of whether counsel was ineffective and whether the defendant was prejudiced by any ineffective assistance of counsel as questions of mixed law and fact. Based upon the standard of review, we affirm the trial court's order.
In this appeal Cherry argues that substantial mitigation exists which could have been discovered and presented during the penalty phase of the trial including the following statutory mitigators: (1) Cherry suffered from an extreme mental or emotional disturbance at the time of the offense; (2) Cherry acted under extreme duress or under the substantial domination of another person; and (3) Cherry's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. The nonstatutory mitigators include: (1) Cherry's father violently abused him as a child; (2) Cherry suffers from borderline intelligence or borderline retardation; (3) Cherry has a history of substance abuse from crack cocaine and alcohol; (4) Cherry was under the influence of drugs or alcohol at the time of the offense; (5) Cherry witnessed extreme violence as a youth; (6) Cherry suffers from fetal alcohol syndrome because his mother drank alcohol while pregnant; (7) Cherry has organic brain damage; and (8) Cherry came from an impoverished family.
The United States Supreme Court in Strickland set forth the standards to be applied by courts in analyzing claims based on ineffective assistance of counsel:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland, 466 U.S. at 687, 104 S.Ct. 2052; accord Rivera v. State, 717 So.2d 477 (Fla. 1998); Robinson v. State, 707 So.2d 688 (Fla.1998); Rose v. State, 675 So.2d 567 (Fla.1996). In further explaining the first prong of the test, the Supreme Court stated that "the defendant must show that counsel's representation fell below an objective standard of reasonableness" based on "prevailing professional norms." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. Under the second prong of the test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. The Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id. Thus, to prevail on a claim of ineffective assistance of counsel in the penalty phase of the trial, the defendant must demonstrate that there is a reasonable probability that, absent trial counsel's error, "the sentencer... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. 2052.
Cherry argues this case is synonymous with Rose. However, Rose is distinguishable *1049 from the facts in this case.[1] We summarized the evidence in Rose as follows:
Rose presented evidence at the hearing below that the following information was available had counsel conducted a reasonable investigation: (1) Rose grew up in poverty; (2) Rose was emotionally abused and neglected throughout his childhood; (3) Rose's mother locked him in a closet for extended periods of time as a child and tried to lose him and leave without him when they were out; (4) Rose was a slow learner and was retained in the fourth, fifth, and seventh grades; (5) Rose's I.Q. is 84; (6) Rose was severely injured in a 30-foot fall and suffered head trauma, chronic blackouts, dizziness, and blurred vision; (7) Rose is a chronic alcoholic; and (8) Rose had previously been characterized by a physician as schizoid.
In addition, Dr. Jethro Toomer, a clinical and forensic psychologist, testified that: (1) Rose suffers from organic brain damage; (2) Rose has a long-standing personality disorder; (3) Rose is a chronic alcoholic; (4) Rose meets the criteria for the statutory mitigator of being under the influence of an extreme emotional or mental disturbance at the time of the offense, see § 921.141(6)(b), Fla. Stat. (1993); and (5) Rose's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired at the time of the offense, see id. § 921.141(6)(f). Dr. Toomer's opinion was based on a psychosocial evaluation of Rose in which he administered a battery of psychological tests and reviewed Rose's school, hospital, medical and prison records. His testimony was essentially uncontested. In addition to the evidence outlined above, Rose presented substantial lay testimony regarding mitigation at the postconviction hearing which had not been investigated or was not presented by counsel during the penalty phase proceedings.
675 So.2d at 571. We found it abundantly clear that counsel did not conduct a reasonable investigation into Rose's background and, had he done so, substantial, unrebutted mitigating evidence would have been discovered. See id. at 572. We further found that counsel's decision to rely on a far-fetched theory that even he did not believe "was neither informed nor strategic" and resulted from his incompetency and lack of experience in capital cases. Id. at 573.
In the present case, it appears at first blush that counsel failed to properly conduct the penalty phase of the trial. No witnesses were called, and only one objection was raised during the entire proceeding. Counsel's closing argument referred to biblical references and did not address the mitigating or aggravating circumstances in this case. However, counsel's actions must be considered in light of other factors such as trial strategy. See Rose, 675 So.2d at 572. The trial court noted that by admitting Dr. Barnard's report instead of calling him as a witness, *1050 the defense eliminated the State's ability to cross-examine the facts presented in the report. Additionally, the trial court found Cherry's present claim that he was under the influence of drugs and alcohol at the time of the offense to be refuted by his testimony during the trial. Even if this mitigator did exist, it would have been inconsistent with Cherry's theory of defense during trial (i.e., that he did not commit the offense). Therefore, the trial court found that counsel was not deficient in failing to present a mitigator that was not supported by the record or would have been inconsistent with the evidence and testimony presented by the defendant. We agree.
Cherry testified during trial and admitted to drinking several beers on the night of the murder. In his interview with Dr. Barnard, Cherry admitted to smoking crack cocaine on June 28, 1986. However, nowhere in his testimony does Cherry indicate that he was intoxicated on the night of the murder.
Dr. Barry Crown, a psychologist who was hired by Cherry's postconviction counsel in July 1996 for purposes of the 1996 evidentiary hearing, did not provide any facts to support his conclusion that Cherry was under the influence of alcohol or drugs at the time the murders were committed. Thus, counsel was not deficient in failing to present a mitigator unsupported by the record. Further, Cherry maintained throughout trial that he was not present at the scene of the murder and that he was innocent of all charges against him. Therefore, to argue in mitigation that Cherry was intoxicated at the time of the offense would be wholly inconsistent with the theory of defense, and therefore counsel cannot be deemed ineffective for failing to present it. See Rose v. State, 617 So.2d 291, 294 (Fla.1993)("When a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made.").
Finally, as noted above, Cherry failed to provide defense counsel with the names of any witnesses who would testify on Cherry's behalf. During the evidentiary hearing, trial counsel testified that Cherry did not provide him with names of any witnesses who could have provided mitigating evidence. Further, upon commencement of the penalty phase proceeding, trial counsel asked Cherry in open court whether he knew "of anyone who would be able to come in and substantiate mitigating grounds that the Court has enumerated here." Cherry responded in the negative. As the Supreme Court noted in Strickland, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. By failing to provide trial counsel with the names of witnesses who could assist in presenting mitigating evidence, Cherry may not now complain that trial counsel's failure to pursue such mitigation was unreasonable. See id. Accordingly, it appears the trial court correctly found that counsel was not deficient in failing to investigate and present mitigating evidence because Cherry refused to communicate with trial counsel or provide him with names of witnesses to call for mitigation purposes.
Even if this Court found counsel's conduct to be deficient, Cherry would not be entitled to a new sentencing unless he showed prejudice from counsel's alleged errors. The trial court found four aggravating factors in this case: the murder was committed during a burglary; the murder was committed for pecuniary gain; Cherry had a prior violent felony conviction; and the murder was HAC. Although we later held that the murder during the commission of a burglary and pecuniary gain aggravators *1051 should have been considered as one, that still leaves three aggravating factors, one of which is HAC. The trial court also instructed the jury on three statutory mitigating factors: the crime for which the defendant was to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance; the defendant acted under extreme duress or under the substantial domination of another person; and the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. These are the same three mitigators Dr. Crown believes to exist in this case. The jury was also instructed that it could consider any aspect of the defendant's character.
Unlike Rose, however, the testimony concerning the statutory mitigating evidence and some of the nonstatutory mitigating evidence was controverted either by the State during cross-examination or by Dr. Barnard. The trial court rejected Dr. Crown's conclusions as to organic brain damage, fetal alcohol syndrome, and mental retardation to the extent they were based on mere speculation from the fact that Cherry's mother drank while pregnant and Cherry had been exposed to toxins as a child. Dr. Crown admitted that he had not performed any physical tests on Cherry to confirm these conclusions. The trial court also found that Dr. Crown's findings as to Cherry's borderline retardation and antisocial personality were contradicted by Dr. Barnard's reassessment of Cherry. Most significantly, Dr. Barnard, after considering the same background materials supplied to Dr. Crown, did not find any indication of organic brain damage and maintained the information did not support any statutory mitigating factors. The applicability of mitigating circumstances and the credibility of expert testimony are matters within the sound discretion of the trial court. See Rose, 617 So.2d at 293 ("The trial court has broad discretion in determining the applicability of mitigating circumstances and may accept or reject the testimony of an expert witness.") (citing Roberts v. State, 510 So.2d 885 (Fla.1987)).
Additionally, even if trial counsel should have presented witnesses to testify about Cherry's abusive background, most of the testimony now offered by Cherry is cumulative to that stated in Dr. Barnard's report. Although witnesses provided specific instances of abuse, such evidence merely would have lent further support to the conclusion that Cherry was abused by his father, a fact already known to the jury. It should also be noted that Cherry was thirty-five years old when he committed these murders, and his father had died almost eighteen years before that. The only unrefuted factors now presented that were not offered during the penalty phase include: Cherry's history of alcohol and substance abuse[2] and Cherry's borderline intelligence. Even if the jury had considered these factors, they do not appear to be sufficiently weighty to overcome the three aggravating factors in this case and the brutal nature of Mrs. Wayne's death. We find this case to be similar to Sims v. Singletary, 155 F.3d 1297 (11th Cir.1998), in which the Eleventh Circuit determined that a claim for ineffective penalty-phase counsel should be denied.
Cherry's second issue is related to his first one. This issue claims that he was denied a competent mental health *1052 evaluation because counsel was ineffective in failing to provide the mental health expert with background information and for failing to obtain an evaluation of Cherry's organic brain function. The trial court rejected this claim on grounds similar to those stated above: namely, that defendant failed to present evidence beyond speculation to support the mitigating circumstances that he suffered from organic brain damage and was mentally retarded. Therefore, the trial court ruled that trial counsel cannot be deemed ineffective for failing to present evidence of such conditions.
As to the ineffectiveness prong of Strickland, we find whether counsel was deficient to be a close question. Although Dr. Barnard indicated that counsel sent him information from which to conduct an evaluation, this information did not include school records and affidavits from family members. Rather, the psychological report prepared by Dr. Barnard indicates that he received background information from Cherry during a two-hour interview and self-report. While the report indicates Dr. Barnard was aware of Cherry's abusive background and the beatings he endured by his father, Dr. Barnard admitted during the evidentiary hearing that he did not conduct any psychological tests on Cherry. Dr. Barnard also admitted that his examination was limited to competency and sanity issues. Counsel admitted that he did not request an evaluation for the purpose of providing mitigating evidence during the penalty phase of the trial. Of course, counsel's conduct depends on the defendant's conduct and on possible tactical decisions at the time. As noted above, Cherry failed to provide counsel with names of any potential witnesses. Thus, while counsel appears to have failed to give Dr. Barnard sufficient information upon which to base an evaluation, counsel testified at the hearing that he would have given Dr. Barnard everything within his possession, which in this case was apparently very little because of Cherry's alleged lack of cooperation.
However, we find that even if counsel was deficient, it does not appear that Cherry was prejudiced by counsel's failure to provide Dr. Barnard with sufficient information or to ensure a competent evaluation. Dr. Barnard's report indicates that he was aware of Cherry's background and possible alcohol and drug use. Further, Dr. Barnard was given four volumes of information in 1992 (as was Dr. Crown) to consider. After reviewing the materials, Dr. Barnard concluded that no statutory mitigators existed and that Cherry satisfied the criteria for antisocial personality disorder. Even though Dr. Barnard conceded that three nonstatutory mitigators existed, the majority of the supplemental evidence pertains to Cherry's abusive background and therefore is cumulative to Dr. Barnard's initial findings in his report. The fact that Cherry found a new expert who reached conclusions different from those of the expert appointed during trial does not mean that relief is warranted under Florida Rule of Criminal Procedure 3.850, see Rose, 617 So.2d at 295, especially where there is no evidence other than Dr. Crown's statement that Dr. Barnard conducted a superficial examination that Dr. Barnard's evaluation was insufficient. Id.
Cherry's reliance on Starr v. Lockhart, 23 F.3d 1280 (8th Cir.1994), is misplaced. In that case, the defense attorney requested a mental health expert to assist in developing defense strategy during the guilt phase of the trial and in presenting mitigating evidence during the sentencing portion of the trial. The trial court denied the motion on the ground that defendant had already been provided a mental health expert for the purpose of determining *1053 competency. Upon review of the district court's denial of Starr's writ of habeas corpus, the circuit court held that Starr was denied an adequate mental health evaluation in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (defendant entitled to competent mental health evaluation where defendant's mental condition is serious issue in case). See Starr, 23 F.3d at 1294. Starr does not address a claim for ineffective assistance of counsel for failing to provide the mental health expert with sufficient information, and therefore it is not dispositive of the claim raised herein.
Accordingly, we affirm the trial court's denial of this claim since Cherry has not demonstrated prejudice under Strickland.
In respect to Cherry's third issue concerning the alleged constitutional infirmity as to the jury instructions and improper argument, we likewise find this issue to be without merit. The various subissues in issue three are all presented as ineffective assistance of counsel claims. First, Cherry contends counsel should have investigated the circumstances of the prior convictions to determine if there was a basis upon which to challenge them. However, as the trial court correctly noted, Cherry does not offer any evidence or explanation as to why the prior convictions were invalid or improperly considered. Absent any indication that the prior convictions were improperly applied, Cherry has not demonstrated that counsel was deficient in failing to investigate the circumstances of those crimes. See generally Kennedy v. State, 547 So.2d 912, 913 (Fla.1989) (motion for postconviction relief under Strickland must allege specific facts and not conclusory allegations).
Next, Cherry argues that counsel should have requested a limiting instruction on the aggravating factors that the murder was committed during a burglary and that the murder was committed for pecuniary gain. While our case law now holds that it is error for the trial court not to give a limiting instruction when one is requested, see Castro v. State, 597 So.2d 259, 261 (Fla.1992), at the time of Cherry's trial there was no error in the jury considering two aggravators based on the same aspect of the crime so long as the trial court did not improperly double those aggravators in its sentencing order. See Suarez v. State, 481 So.2d 1201 (Fla.1985). We have consistently held that trial counsel cannot be held ineffective for failing to anticipate changes in the law. See Nelms v. State, 596 So.2d 441, 442 (Fla.1992); Stevens v. State, 552 So.2d 1082, 1085 (Fla. 1989). Thus, it does not appear counsel was deficient in failing to request a limiting instruction.
Third, Cherry claims counsel should have objected to the vague jury instructions for the HAC aggravating factor because governing authority from the United States Supreme Court indicated that this instruction was constitutionally infirm. See Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Cherry was convicted in 1987. Thus, counsel cannot be deemed ineffective for failing to object to the HAC instruction on the basis of Maynard since it had not yet been decided. See Stevens. Godfrey, however, had been decided and arguably could have formed the basis for any objection on vagueness grounds. However, even if counsel should have objected to the wording of the statute, there is no prejudice shown because the trial court likely would have found the murder of Mrs. Wayne to be HAC under any definition. Indeed, the Court found the State established the existence of this aggravator beyond *1054 a reasonable doubt. See Cherry, 544 So.2d at 187-88. Thus, Cherry has not demonstrated prejudice sufficient to warrant a new sentencing proceeding.
Cherry argues counsel was ineffective in failing to object to a litany of other jury instructions, including counsel's failure to object to instructions on the ground that they forced Cherry to prove that mitigating circumstances outweighed the aggravators and precluded the jury from considering sympathy or mercy in sentencing Cherry; counsel's failure to object to instructions on the ground that they improperly advised the jury of its role in sentencing; and counsel's failure to object to an instruction on the ground that it advised the jury to consider Cherry's significant history of prior criminal activity as a nonstatutory aggravating factor. As for the claim pertaining to the jury's role, the trial court properly instructed the jury that its role was advisory, and thus counsel cannot be deemed ineffective for failing to object to proper jury instructions. See Mendyk v. State, 592 So.2d 1076, 1080 (Fla.1992). We find the remaining contentions concerning the jury instructions and the improper argument to be without merit. Moreover, even if counsel was deficient in failing to object to the instructions and to the closing argument, Cherry has not demonstrated prejudice.
Finally, in his fourth claim Cherry claims error in the trial court's denial of Cherry's motion to perpetuate testimony of out-of-state witnesses. This issue concerns Florida Rule of Criminal Procedure 3.190(j). The decision whether to grant a motion to perpetuate testimony lies within the discretion of the trial court. See Montoya-Navia v. State, 691 So.2d 1144 (Fla. 3d DCA 1997). The rule allows the trial court to deny the motion if made within ten days of the trial or hearing. See Fla. R.Crim. P. 3.190(j)(1).
Here, Cherry failed to comply with the requirements of rule 3.190. On August 6, 1996, Cherry filed a motion for continuance and to perpetuate the testimony of several witnesses who were either beyond the jurisdiction of the trial court (i.e., out-of-state residents) or unavailable to testify. These witnesses were intended to be called at an August 19, 1996, hearing. The trial court denied the motion for continuance but did not rule on the motion to perpetuate testimony. In any event, no depositions were taken. During the evidentiary hearing in December 1996 on Cherry's motion for postconviction relief, Cherry again filed a motion to perpetuate testimony of witnesses who were either out of state or unavailable to testify. These witnesses included Dr. Glen Caddy, Dr. Kris Sperry, and Dr. Diane Lavett. At the hearing, however, counsel for Cherry conceded that none of these witnesses had been subpoenaed to testify. The trial court denied the motion.
In addition, Cherry has not demonstrated that these witnesses were material or necessary to prevent the failure of justice. For example, Dr. Lavett, who specializes in genetics, filed an affidavit stating that in her opinion trial counsel inadequately cross-examined the State's crime laboratory analyst. The essence of her affidavit points to errors or omissions in the examination of the crime scene evidence which should have been brought to light either through cross-examination or rebuttal evidence. However, all of Dr. Lavett's testimony appears to address defense counsel's conduct during the guilt phase of the trial, which is beyond the limited scope of the evidentiary hearing in this case and therefore not material to that proceeding. The record does not reveal what Dr. Caddy would have testified to if deposed. Unlike Dr. Lavett, there is no affidavit by Dr. Caddy in the record, and Cherry did not *1055 elaborate in his brief to this Court or in his motion to perpetuate testimony why Dr. Caddy's testimony would be material to these proceedings. Thus, Cherry has not demonstrated any materiality under rule 3.190(j).
Dr. Sperry, on the other hand, appeared to contest the finding of HAC in this case. In her affidavit she opined that Mrs. Wayne would not have been conscious or in pain at the time of the attack. Although Dr. Sperry does not state that the finding of HAC was erroneous, HAC is inapplicable under Florida law where the victim is unconscious or unaware of impending death at the time of the attack. See Zakrzewski v. State, 717 So.2d 488, 493 (Fla. 1998) (HAC requires showing of awareness of impending death); Jackson v. State, 451 So.2d 458, 463 (Fla.1984) (events occurring after victim loses consciousness may not be considered in finding HAC). Cherry did not argue this point to the trial court or to this Court in the instant appeal. Further, Cherry does not raise as an ineffective assistance claim counsel's failure to contest the finding of HAC.
Accordingly, we affirm the trial court's order denying Cherry's rule 3.850 motion.
It is so ordered.
SHAW, HARDING, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., concurs with an opinion
ANSTEAD, J., dissents with an opinion, in which PARIENTE, J., concurs.
WELLS, C.J., concurring.
I concur with the majority opinion and write only to make the following point in respect to the dissenting opinion. First, I think it is worthy of emphasis that this case now comes to us after an extensive evidentiary hearing. The facts which are referenced in the dissenting opinion as "The Rest of the Story" are facts which were alleged to exist when the case was previously before us and were to be considered by the trial judge in the evidentiary hearing. If those facts were such as to entitle the defendant to a new penalty phase, then this Court would have so concluded at that time, but this court did not do that. Rather, this Court sent for an evidentiary hearing and a determination by the trial court. As to the facts, we must now give deference to the trial court.
Second, I do not believe that this case is "a primary example of why this Court has found it necessary to adopt uniform standards for the qualification of lawyers in capital cases." I expressly do not join in that criticism of this lawyer.
ANSTEAD, J., dissenting.
This case serves as a primary example of why this Court has found it necessary to adopt uniform standards for the qualification of lawyers in capital cases. We are presented with a classic scenario of the ineffective assistance of counsel: an inexperienced lawyer who had never handled a capital case, who essentially defaulted and rendered no assistance to a client whose only hope for life was in the hands of his lawyer. As a result, the penalty phase proceeding was a sham.
Today, with the advent of well-publicized and, in some instances, televised trials, almost all of our citizens are aware that the outcome of judicial proceedings may substantially depend on who you have as your lawyer. Indeed, in our procedural and adversarial system, the competence of the lawyer may often be the most important factor influencing the outcome of a case. In other words, our adversary system of justice simply does not work without the vigorous assistance of competent counsel.
*1056 The United States Supreme Court has long recognized this fact of life and has explained that the purpose behind the constitutional requirement for effective assistance of counsel is to ensure that criminal defendants receive a fair trial, a trial fully testing the defendant's guilt and just punishment under our adversary system of justice. For that reason, the Supreme Court has held that criminal defendants are entitled not just to any counsel, but to competent and effective counsel. See Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Strickland set forth a two-prong test for courts to assess claims based on ineffective assistance of counsel, see id. at 687, 104 S.Ct. 2052, and this Court repeatedly has applied that test in postconviction cases. See Rutherford v. State, 727 So.2d 216 (Fla.1998); Robinson v. State, 707 So.2d 688 (Fla.1998); Rose v. State, 675 So.2d 567, 569 (Fla.1996). As the majority correctly notes, to satisfactorily assert a claim under Strickland:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
466 U.S. at 687, 104 S.Ct. 2052.[3] The Strickland Court further explained that *1057 "[t]he benchmark for judging any claim for ineffectiveness must be whether counsel's neglect so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686, 104 S.Ct. 2052.
The Court also took special pains to explain that the standard of proof for ineffectiveness claims was not the same as the high standard of proof for seeking a new trial based upon the discovery of new evidence:
An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.
Id. at 694, 104 S.Ct. 2052. Citing to Strickland, the Fourth Circuit Court of Appeals has recently further explained the application of this standard:
With respect to the prejudice requirement, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." The level of certainty is something less than a preponderance; it need not be proved that counsel's performance more likely than not affected the outcome. Instead, the petitioner need only demonstrate "a probability sufficient to undermine confidence in the outcome."
*1058 Young v. Catoe, 205 F.3d 750, 759 (4th Cir.2000) (citations omitted). Hence, trial and appellate courts must be very careful to apply the correct standard.
The majority concedes "that counsel failed to properly conduct the penalty phase of the trial." Majority op. at 1049. Despite this recognition of trial counsel's obvious default, however, the majority nevertheless concludes that counsel was not deficient because he placed into evidence a brief psychological report finding the defendant sane and competent for trial. See majority op. at 1049-50. In fact, it appears that the majority's entire premise for approving counsel's performance is based on counsel's singular act of placing the report in evidence, even though counsel never referred to it once in his address to the jury, and the State used the report against the defendant. In finding Cherry's counsel's performance adequate, the majority virtually has ignored the essential requirement of Strickland that there be a vigorous testing of the appropriate punishment under our adversary system by a lawyer for the defendant who is prepared on the law and the facts, so that we can have confidence in the reliability of the outcome.

THE REST OF THE STORY
In stark contrast to the majority's assessment, the record from the proceedings below establishes without contradiction that Cherry's trial counsel essentially rendered no assistance to his client in this, counsel's first capital case.[4] Counsel conducted absolutely no independent investigation into the existence of mitigating evidence; he never requested a mental health expert to assist during the penalty phase of the trial, despite Cherry's long history of serious mental health problems; he failed to present any witnesses as to any mitigation whatsoever, including Cherry's impoverished and abusive family background and long history of alcohol and drug abuse; and his brief closing argument quoting the Bible did not contain a single reference to the relevant mitigating or aggravating circumstances that the jury would be told by the trial court must be the framework used in order to make a recommendation of life or death.
In fact, the record reflects that, other than the arguments of the lawyers, the following encompasses the entire penalty phase proceeding:
MR. MARSHALL: Your Honor, the State has no testimony to present at this time or additional evidence and we will rely on the testimony and evidence presented during the course of the trial.
THE COURT: Mr. Miller?
MR. MILLER: Judge, we have one report we would like to put in at this time, mark it for identification purposes. I previously provided a copy of the report to Mr. Marshall. We would also offer that into evidence at this time.
THE COURT: What say the State?
MR. MARSHALL: Your Honor, as I understand the report, this is a report done by Doctor George Barnard on or about September 10, 1987, regarding an *1059 interview and evaluation of this Defendant. Believing that to be what is now being offered in evidence, the State has no objection.
MR. MILLER: That is what it is.
THE COURT: Mr. Clerk, receive the report and admit it into evidence.
Any further testimony or evidence, Mr. Miller?
MR. MILLER: No, Your Honor.
THE COURT: You may proceed to your final argument.
We do not have to wonder about counsel's performance. The record speaks for itself.

COUNSEL'S PERFORMANCE
Of course, the main question we must consider before assessing counsel's performance is the responsibility a lawyer has to a client facing a penalty proceeding in a capital case. The answer is pretty straightforward. Since the Florida statutory scheme for capital cases provides that a sentencing judge and jury must analyze the penalty issue based upon a consideration of aggravating and mitigating circumstances, defense counsel must, accordingly, diligently investigate and present evidence and persuasive argument to the judge and jury based upon this statutory framework. Counsel here simply never did this. Defense counsel never investigated mitigation, never presented evidence, never mentioned mitigation, and never argued the existence of any mitigating factors or evidence to the jury. In other words, defense counsel gave no indication whatsoever that he was even aware of the law of aggravating and mitigating circumstances that applied to the penalty phase proceedings of a capital case and his consequent responsibility to his client in those proceedings.
Further, counsel's closing argument not only failed to discuss mitigation, but it also offered no rebuttal to the State's arguments relating to the existence of aggravating factors or to reasons why the jury should discount the mitigating factors. Rather, as noted, counsel's entire summation rested on biblical references strung together in an incoherent plea. In other words, the argument made by counsel was totally irrelevant to the proper analysis that the jury was instructed by the court it must perform in deciding on a recommendation of life or death, i.e., a comparative analysis of the mitigating and aggravating circumstances.

ABUNDANCE OF MITIGATING CIRCUMSTANCES
Of course, if the record reflected that there were no mitigating circumstances that existed to be discovered by a lawyer conducting a reasonable investigation, the defendant might be hard pressed to demonstrate that his lawyer's default made any difference. But that is not the case here.
In stark contrast to trial counsel's ignorance of the law and the facts, Cherry presented extensive evidence and witnesses at the postconviction evidentiary hearing establishing that a wealth of mitigating circumstances existed at the time of the earlier trial: evidence simply waiting for counsel to find and present to the judge and jury in an attempt to save Cherry's life. Many of the witnesses testified in great detail about Cherry's extremely abusive and poverty-stricken childhood. This testimony revealed, for example, that Cherry's father was an alcoholic who routinely beat Cherry. Many, many examples of abuse and maltreatment were detailed. Samples included an occasion when Cherry's father fastened a chain around Cherry's neck and "drug [sic] him home like he was a dog." In a separate incident, Cherry's father tied Cherry's hands with a kerosene-soaked rope and then beat him *1060 "[l]ike he was trying to kill him." The record further reveals that Cherry's mother was an alcoholic and suffered from epileptic seizures, which at times turned violent. As a child Cherry had witnessed numerous violent episodes and had regularly inhaled gasoline before eventually turning to marijuana and crack cocaine.
Cherry also presented expert testimony from Dr. Barry Crown, a neuropsychologist who examined Cherry in 1996. As part of his evaluation of Cherry, Dr. Crown administered a battery of tests to assess the relationship between Cherry's brain function and his behavior. He concluded that Cherry is borderline retarded, suffers from brain damage, and is significantly impaired in several functional areas, such as problem-solving, processing information, concentration and attention, nonverbal memory, and auditory selective attention. Cherry also exhibits difficulty in comprehending the long-term consequences of his behavior. According to Dr. Crown, the above findings would support the existence of three important statutory mitigators: (1) Cherry suffered from extreme mental or emotional disturbance at the time of the offense; (2) Cherry acted under extreme duress or under the substantial domination of another person; and (3) Cherry's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. Dr. Crown also recognized the existence of several nonstatutory mitigators, such as brain damage, fetal alcohol syndrome, child abuse, deprived childhood, long history of alcohol and substance abuse, and exposure to toxic chemicals. None of this important mitigation was ever considered by the jury deciding whether Cherry should live or die.
During the evidentiary hearing, Dr. Barnard, who had previously examined Cherry solely for purposes of sanity and competency to stand trial, now also agreed that several important mitigators could have been presented in this case: (1) Cherry possesses borderline intelligence; (2) Cherry has a history of substance and alcohol abuse; and (3) Cherry was abused as a child. Dr. Barnard based this opinion on mitigation evidence never made available to him before, because no prior investigation had been done by trial counsel and trial counsel never sought Dr. Barnard's help for mitigation purposes. Importantly, Dr. Barnard's current opinion that Cherry appears to possess borderline intelligence directly contradicts his initial assessment that Cherry was of average intelligence, a fact that was stated in Barnard's report placed into evidence by counsel.
The majority simply ignores the plethora of mitigating facts offered during the postconviction hearing that the judge and jury never heard. As noted above, for example, both mental experts acknowledged the existence of extensive evidence of mitigation including child abuse, borderline intelligence or borderline retardation, and extensive history of substance abuse from crack cocaine and alcohol. While the information presented in the postconviction proceedings was clearly available at the time of Cherry's trial, none of it had been investigated by counsel, much less presented through live witnesses.

THE REPORT
It is extremely important to make clear that the report referred to by the majority is clearly a "red herring" since the report was not rendered for purposes of exploring mitigation or for use at the penalty phase, and the contents of the report were in fact damaging to Cherry.[5] Indeed, the mental expert who rendered the report had examined Cherry solely for sanity and competency *1061 purposes relevant only to the guilt phase of the proceedings; and on those issues the expert rendered an opinion damaging to Cherry, i.e., that Cherry was sane and competent. The report concluded that Cherry was of average intelligence with no indication of mental impairment or deficiency, information hardly helpful to Cherry's cause. Not surprisingly, during his presentation to the jury, Cherry's trial counsel never mentioned the report or its contents to the jury, offer any insight as to the report's significance, or indicate how the findings in the report may have mitigated Cherry's conduct. If this were not enough, the record reflects that the State actually relied on the report in its argument for the death penalty to the jury.
The majority fails to acknowledge the State's use of the report against Cherry or that the report contained information damaging to Cherry. For example, the report indicates that Cherry was convicted of aggravated battery for stabbing a man in the hand with a broken bottle. The report also indicates, without explanation, four prior criminal offenses for which Cherry served time in jail: (1) a 1967 breaking and entering; (2) a 1977 breaking and entering; (3) a 1979 grand larceny; and (4) a 1980 strong-armed robbery. According to the report, Cherry served five years in prison for the strong-armed robbery conviction and was released from prison in June 1985. The State properly argued during closing argument that the jury could consider Cherry's previous robbery conviction in aggravation because it involved violence or threat of violence. However, the jury was never instructed that it could not properly consider the other offenses detailed in the report as statutory aggravation supporting the death penalty. Rather, when the State argued that "[Cherry] has a criminal history of violent behavior," the jury would naturally assume that the State was relying on the criminal convictions mentioned in the report. From this, the jury could easily have concluded, based upon defense counsel's introduction of the report, that Cherry had a twenty-year history of serious offenses, which appear to be escalating in terms of degree of violence, the latest of which resulted in murder. Counsel obviously did not know enough to either keep the report out, to have the damaging information deleted, or inform the jury that it could not consider prior convictions not involving violence.

THE LAW
Moreover, it is apparent that counsel's failure to investigate Cherry's background and mental health fell short of the standard for reasonable professional assistance and was not the result of any tactical or strategic decision. See Rose, 675 So.2d at *1062 572; State v. Lara, 581 So.2d 1288, 1290 (Fla.1991) (holding defendant was entitled to a new penalty phase proceeding where trial counsel did not investigate defendant's background, did not properly utilize expert witnesses, and virtually ignored penalty portion of the trial).
In Porter v. Singletary, 14 F.3d 554 (11th Cir.1994), the Eleventh Circuit stated the following three-part analysis in considering a claim based on trial counsel's failure to investigate and present mitigating evidence:
First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such choice must be given a strong presumption of correctness, and the inquiry is generally at an end. If the choice was not tactical and the performance was deficient, then it must be determined whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.
Id. at 557 (citations omitted); accord Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir.1995); Blanco v. Singletary, 943 F.2d 1477, 1500 (11th Cir.1991); cf. Rose, 675 So.2d at 571 ("The failure to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so."). Obviously, you cannot make strategic decisions until and unless you are knowledgeable about the law that controls and have sufficiently investigated the facts. After reviewing the record in this case in light of the above test, it is inconceivable that anyone could conclude that trial counsel was not deficient. As noted above, the record reveals that counsel failed to conduct any investigation of the defendant's background for mitigation purposes.[6] How can counsel make a tactical decision not to present mitigation if counsel is not aware of what evidence even exists? Therefore, contrary to the majority's conclusion, the failure to present sufficient mitigating evidence was not the result of a tactical decision.
Interestingly, even without any presentation of mitigating evidence or competent advocacy by Cherry's lawyer the jury was sharply split in its recommendation of punishment, voting only by the slimmest of margins, seven to five in one case, for death. Similarly, and again limited by a record essentially devoid of mitigation, this Court actually set aside one of the death sentences imposed. On this record it is apparent that the jury, the sentencing judge and this Court would have all been influenced by the substantial mitigation that our system of justice mandates should have been investigated and presented by counsel in this case.
The question really is whether we can have confidence in the outcome of a proceeding that in no way resembles what a properly conducted penalty phase proceeding should be. Penalty phase proceedings are conducted for the express purpose of having a jury hear evidence of aggravation and mitigation and of having an advocate for the defendant demonstrate why, considering that evidence, the defendant's life should be spared. That simply never happened here.
PARIENTE, J., concurs.
NOTES
[1] Cherry also relies on Phillips v. State, 608 So.2d 778 (Fla.1992), and State v. Lara, 581 So.2d 1288 (Fla.1991). However, these cases are distinguishable. In both cases, the defense presented uncontroverted mitigating evidence that had not been presented during the penalty-phase proceeding but could have been had trial counsel conducted a reasonable investigation. Unlike the defendants in Lara and Phillips, Cherry presented an expert witness at the evidentiary hearing whose conclusions were rejected by the trial court or refuted by the State and the expert appointed to evaluate Cherry during trial. Additionally, much of the evidence presented at the postconviction hearing was cumulative to evidence admitted during the penalty phase.
[2] Dr. Barnard's report does mention alcohol and drug use from the time Cherry was fifteen years of age. However, the report reflects that Cherry apparently denied any abuse of such substances.
[3] In elaborating on the prejudice prong of the two-part analysis, the Court stated:

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, cf. United States v. Valenzuela[-]Bernal, 458 U.S. 858, 866-867[, 102 S.Ct. 3440, 73 L.Ed.2d 1193] (1982), and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. Respondent suggests requiring a showing that the errors "impaired the presentation of the defense." Brief for Respondent 58. That standard, however, provides no workable principle. Since any error, if it is indeed an error, "impairs" the presentation of the defense, the proposed standard is inadequate because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding.
On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. Moreover, it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence. Nevertheless, the standard is not quite appropriate.
Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. Cf. United States v. Johnson, 327 U.S. 106, 112[, 66 S.Ct. 464, 90 L.Ed. 562] (1946). An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.
Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, United States v. Agurs, 427 U.S., at 104, 112-113[, 96 S.Ct. 2392], and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, United States v. Valenzuela-Bernal, supra, 458 U.S., at 872-874[, 102 S.Ct. 3440]. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
. . . .
The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencerincluding an appellate court, to the extent it independently reweighs the evidence would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.
Id. at 693-96, 104 S.Ct. 2052 (emphasis added) (citation omitted).
[4] While the inexperience of trial counsel is insufficient, in and of itself, to render counsel's performance deficient, see United States v. Cronic, 466 U.S. 648, 665, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); Remeta v. Dugger, 622 So.2d 452, 454 (Fla.1993), it is factor to consider. See Rose, 675 So.2d at 573. Sadly, the events in this case could not present a better example of the classic situation of an inexperienced lawyer handling a case which clearly supersedes his level of experience, knowledge or skill in capital law. At the evidentiary hearing, Cherry's trial counsel, David Miller, testified he had never handled a capital case before and he previously had handled only one case involving mental health issues, and that case had never reached trial.
[5] The majority suggests that counsel exercised a strategic choice in using the psychological report because the State could not cross-examine a report. This analysis is flawed for at least two reasons. First, the record does not support the conclusion that defense counsel exercised any strategy; rather, the record reflects that at the postconviction hearing, defense counsel could not recall any evidence he presented during the penalty phase proceeding, he had no independent recollection of admitting Dr. Barnard's report in evidence, and he did not provide any reasons for conducting the penalty proceedings as he did.

Second, trial counsel has an absolute legal and ethical duty to reasonably investigate and present mitigating evidence on behalf of the capital defendant, including evidence of the defendant's background, see Rose, 675 So.2d at 571 ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.") (quoting Baxter v. Thomas, 45 F.3d 1501, 1512-13 (11th Cir. 1995)), and the failure to do so cannot be deemed a tactical decision. See Baxter, 45 F.3d at 1514 ("[O]ur case law rejects the notion that a `strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.") (quoting Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991)).
[6] Cherry's trial counsel testified that he had discussed this case with an investigator but that he does not recall the content of those conversations. The only other person counsel recalls talking to was Cherry's girlfriend.