854 So.2d 1235 (2003)
Matthew MARSHALL, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1186.
Supreme Court of Florida.
June 12, 2003.
Rehearing Denied September 8, 2003.
*1237 Melissa Minsk Donoho, Special Assistant CCRC-South, and Leor Veleanu, Staff Attorney, CCRC-South, Office of the Capital Collateral Regional Counsel-South, Fort Lauderdale, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Debra Rescigno, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Matthew Marshall, a prisoner under sentence of death, appeals the trial court's denial of his motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we remand for an evidentiary hearing on one issue, but affirm the trial court's order denying Marshall postconviction relief on all the other issues raised herein.

BACKGROUND
Matthew Marshall was convicted and sentenced to death for the 1988 murder of Jeffrey Henry. This Court previously summarized the facts in this case as follows:
Marshall and the victim, Jeffrey Henry, were both incarcerated at the Martin Correction Institute on November 1, 1988, when witnesses heard muffled screams and moans emanating from Henry's cell and observed Marshall exiting the cell with what appeared to be blood on his chest and arms. Within a few minutes, Marshall reentered the cell, and similar noises were heard. After the cell became quiet, Marshall again emerged with blood on his person. Henry was found dead, lying in his cell facedown with his hands bound behind his back and his sweat pants pulled down around his ankles to restrain his legs. Death was caused by blows to the back of his head.
Marshall was charged with first-degree murder. His defense at trial was that he killed Henry in self-defense. Marshall claimed that Henry was a *1238 "muscle man" for several inmates who operated a football pool. When Marshall tried to collect his winnings from the inmates, they told him to get the money from Henry. Marshall claims he entered Henry's cell only to collect his winnings but that Henry refused to pay, and that Henry then attacked him, so he fought back.
See Marshall v. State, 604 So.2d 799, 802 (Fla.1992). The jury found Marshall guilty of first-degree murder and recommended a sentence of life imprisonment. The trial court, however, rejected the jury's recommendation and imposed a sentence of death. In so doing, the trial court concluded that facts supporting a conclusion that the mitigating circumstances did not outweigh the aggravating circumstances were "so clear and convincing that no reasonable person could differ." [1] This Court, in a four-to-three opinion, affirmed the jury override on appeal. See id. at 805-06. The United States Supreme Court denied Marshall's petition for writ of certiorari on May 17, 1993. See Marshall v. Florida, 508 U.S. 915, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993).
Marshall filed his initial 3.850 motion in August of 1994. On January 29, 1999, Marshall filed his final amended 3.850 motion, raising twenty-seven claims.[2] Following *1239 a Huff[3] hearing, the trial court entered an order granting an evidentiary hearing on claims (3), (11), (17), and (23) of Marshall's amended motion, and summarily denying Marshall's remaining claims. The trial court held an evidentiary hearing on August 23-26, 1999. Thereafter, the trial court entered an order denying all relief. This appeal follows.

ANALYSIS
Marshall raises five issues on appeal: (1) whether the trial court erred in denying an evidentiary hearing on Marshall's claim of juror misconduct; (2) whether the trial court erred in denying Marshall's claim alleging ineffective assistance of counsel; (3) whether the trial court erred in denying Marshall's claim that the State withheld exculpatory information; (4) whether the trial court failed to conduct an adequate cumulative error analysis; (5) whether the trial court erred by summarily denying meritorious claims. We will discuss them in turn.

Juror Misconduct
First, Marshall argues that the trial court erred in denying an evidentiary hearing on his claim of juror misconduct. In his postconviction motion, Marshall alleged that racial remarks and jokes and the jury's consideration of non-record materials deprived him of a fair and impartial jury. To support his claim, Marshall attached three sworn affidavits to his postconviction motion. Two of the affidavits were from jurors in Marshall's trial, and the other affidavit was from an attorney, Ronald Smith. The trial court summarily denied this claim without conducting an evidentiary hearing.
According to Mr. Smith's affidavit, he received a telephone call from a woman who claimed that she had served on the jury in Marshall's case.[4] During the phone conversation with Mr. Smith, the woman purportedly indicated that (1) some jurors decided Marshall was guilty before the trial was over; (2) some jurors told racial jokes about Marshall; (3) some jurors announced during the guilt phase that they were going to vote for a guilty verdict and life sentence because they wanted Marshall to return to prison to kill more black inmates; and (4) some jurors, despite the trial judge's orders forbidding it, read and discussed articles concerning the trial. Mr. Smith, however, was unable to recall the name of the woman who called his office.
By contrast, the two juror affidavits discussed matters pertaining to the jury's deliberations. In her affidavit, juror Bachmann indicated that during the course of the guilt phase deliberations there were some jurors who did not want to vote for first-degree murder, and there was a concern that there might be a hung jury. She noted that a verdict finding Marshall guilty of first-degree murder was reached once there was an understanding that the jury would vote unanimously for a life sentence, although some jurors apparently felt Marshall should be sentenced to death. Juror Cunningham stated in her affidavit that during the course of the guilt phase deliberations she informed the other jurors that she did not believe the State had satisfied its burden of proof for first-degree murder, and she was not sure Marshall was guilty as charged. She noted that she compromised her true feelings regarding the case because other jurors *1240 did not want a hung jury. She indicated that she voted for guilty of first-degree murder once it was agreed that the jury would recommend a life sentence.
It is a well-settled rule that a verdict cannot be subsequently impeached by conduct which inheres in the verdict. See, e.g., McAllister Hotel, Inc. v. Porte, 123 So.2d 339, 344 (Fla.1959); Russ v. State, 95 So.2d 594, 600 (Fla.1957). In Marks v. State Road Department, 69 So.2d 771 (Fla. 1954), this Court established guidelines with respect to the propriety of inquiry into matters occurring in the jury room. In particular, this Court explained
[t]hat affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner; but that such affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the Court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow-jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast.
Id. at 774-75 (quoting Wright v. Illinois & Mississippi Telegraph Co., 20 Iowa 195, 210 (1866)) (emphasis omitted); see also Devoney v. State, 717 So.2d 501, 502 (Fla. 1998); McAllister Hotel, Inc., 123 So.2d at 344.
In considering claims of juror misconduct, a court must initially determine whether the facts alleged are matters that inhere in the verdict and are subjective in nature, or are extrinsic to the verdict and objective. See Devoney, 717 So.2d at 502. A juror is not competent to testify about matters inhering in the verdict, such as jurors' emotions, mental processes, or mistaken beliefs. See Baptist Hosp. v. Maler, 579 So.2d 97, 99 (Fla. 1991); State v. Hamilton, 574 So.2d 124, 128 (Fla.1991); see also § 90.607(2)(b), Fla. Stat. (1999).[5] However, jurors may testify as to "overt acts which might have prejudicially affected the jury in reaching their own verdict." Hamilton, 574 So.2d at 128; see also Powell v. Allstate Ins. Co., 652 So.2d 354, 356 (Fla.1995) (holding that racial statements alleged to have been made during deliberations by some members of an all-white jury about black plaintiffs constituted sufficient overt acts which might have prejudicially affected jury in reaching its verdict).
As noted above, Mr. Smith's affidavit states that the woman who called his office indicated among other things that some jurors told racial jokes about Marshall and that some jurors announced during the guilt phase that they were going to vote for a guilty verdict and life sentence because they wanted Marshall to return to prison to kill more black inmates. The alleged juror misconduct set forth in Mr. Smith's affidavit does not appear to inhere in the verdict.
*1241 In Powell v. Allstate Insurance Co., 652 So.2d 354 (Fla.1995), this Court also addressed a claim of racial or ethnic bias as allegedly reflected in statements made by jurors concerning the litigants involved in a case, and whether those statements constituted overt juror misconduct which could be the subject of inquiry after a verdict is returned, or whether such conduct "inhered in the verdict."[6] In holding that such comments constituted overt acts of misconduct, this Court explained:
In the instant case, we find the alleged racial statements made by some of the jurors to constitute sufficient "overt acts" to permit trial court inquiry and action. Under Maler and Hamilton, it would be improper, after a verdict is rendered, to individually inquire into the thought processes of a juror to seek to discover some bias in the juror's mind, like the racial bias involved here, as a possible motivation for that particular juror to as act as she did. Those innermost thoughts, good and bad, truly inhere in the verdict.

But when appeals to racial bias are made openly among the jurors, they constitute overt acts of misconduct. This is one way that we attempt to draw a bright line. This line may not keep improper bias from being a silent factor with a particular juror, but, hopefully, it will act as a check on such bias and prevent the bias from being expressed so as to overtly influence others.
Id. at 357-58 (emphasis added).[7] This Court emphasized that "[t]he issue of racial, ethnic, and religious bias in the courts is not simply a matter of `political correctness' to be brushed aside by a thickskinned judiciary." Id. at 358. Accordingly, the Court remanded the case with instructions for the trial court to conduct an appropriate hearing to ascertain whether racial statements were made as asserted. See id.; see also Wright v. CTL Distribution, Inc., 650 So.2d 641, 643 (Fla. 2d DCA 1995) (stating that appellants, at the very least, must have an opportunity to determine the truth or falsity of juror's allegation in affidavit that racial slurs and comments were made during deliberations).
According to Mr. Smith's affidavit, the woman who contacted him also indicated that some jurors, despite the trial judge's orders, read and discussed outside articles concerning the trial. In Sentinel Communications Co. v. Watson, 615 So.2d 768 (Fla. 5th DCA 1993), the court recognized that an allegation that jurors read newspapers contrary to court orders did not inhere in the verdict. See id. at 772. Indeed, this Court has stated that any receipt by jurors of prejudicial nonrecord information constitutes an overt act subject *1242 to judicial inquiry. See Baptist Hospital, 579 So.2d at 100-01.
Thus, it would appear that the trial court erred in concluding that Marshall's allegations of juror misconduct inhered in the verdict. See Roland v. State, 584 So.2d 68, 70 (Fla. 1st DCA 1991) (finding that motion supported by sworn affidavit of third party indicating that alternate juror had a predisposition to find defendant guilty for matters unrelated to trial warranted juror interviews). Cf. Preast v. Amica Mutual Ins. Co., 483 So.2d 83, 85 (Fla. 2d DCA 1986) (stating that although appellees supported their motion by a hearsay affidavit of a third party, i.e., a juror's sister, they had satisfied the threshold requirement of Florida Rule of Civil Procedure 1.431(g)), disapproved of on other grounds by Baptist Hosp. of Miami, Inc. v. Maler, 579 So.2d 97, 101 n. 2 (Fla.1991). Mr. Smith did recall speaking with the woman alleged to have served on Marshall's jury and he indicated that she was related to one of his clients. Moreover, Mr. Smith indicated that the person who contacted his office was female, and there were only six women on Marshall's jury. Thus, it appears that evidence could be submitted that could identify the purported juror who contacted Mr. Smith to ascertain whether such misconduct took place.
This Court has previously permitted juror interviews during a postconviction proceeding in a capital case based on allegations of juror misconduct discovered years after the trial and direct appeal. In Kelley v. State, 569 So.2d 754 (Fla.1990), the defendant filed a motion to interview the jurors who sat on his original trial while the order denying postconviction relief was on appeal. In the motion, the defendant asserted that two attorneys had recently reported that one of the jurors informed them of certain misconduct on the part of another juror during trial. This Court relinquished jurisdiction to permit the trial judge to interview the jurors. See id. at 762. Notably, the trial judge conducted a hearing in which he interviewed all twelve jurors and the two attorneys who reported the incident, and concluded that misconduct had not been proven. See id. In light of the conflicting evidence at the hearing, we sustained the trial court's finding of no juror misconduct.

Other Jurisdictions
Other jurisdictions, like Florida, are hesitant to interfere with the sanctity of juror deliberations years after trial. However, in cases like the instant case, where the alleged juror misconduct is discovered subsequent to direct appeal, courts have been more willing to inquire if the alleged misconduct, if true, would warrant a new trial. See, e.g., United States v. Jackson, 209 F.3d 1103 (9th Cir.2000) (noting that defendant did not learn of factual predicate for juror misconduct claim until three years after trial).
Many of the cases have remanded the case for an evidentiary hearing to consider the alleged juror misconduct. See, e.g., Fullwood v. Lee, 290 F.3d 663, 680-82 (4th Cir.2002) (remanding for evidentiary hearing on whether contact between juror and her husband throughout trial deprived defendant of a fair trial and had substantial and injurious effect on the verdict); Simmons v. Blodgett, 910 F.Supp. 1519 (W.D.Wash.1996) (noting that state trial court held evidentiary hearing on juror misconduct claim based upon statement of juror made eight years after trial indicating that she read numerous newspaper articles about the case during trial), aff'd, 110 F.3d 39 (1997); People v. Hobley, 182 Ill.2d 404, 231 Ill.Dec. 321, 696 N.E.2d 313, 339-41 (1998) (holding capital defendant was entitled to an evidentiary hearing on *1243 his claim supported by four juror affidavits alleging jurors were intimidated by nonjurors at the hotel where they were sequestered); Campbell v. State, 130 Idaho 546, 944 P.2d 143, 144, 146 (Idaho Ct.App.1997) (noting that trial court held postconviction evidentiary hearing on juror misconduct claim based upon information defendant obtained three years after he began to serve his sentence); State v. Williams, 253 Neb. 111, 568 N.W.2d 246, 251 (1997) (noting that court previously withdrew execution warrant for trial court to hold an evidentiary hearing on petition for postconviction relief alleging juror misconduct, and that eleven of twelve jurors testified at evidentiary hearing).
Some courts have permitted deposition testimony by the jurors to be introduced at the evidentiary hearing. For example, in Massey v. State, 541 A.2d 1254 (Del.1988), the defendant tried to impeach a jury verdict for alleged juror misconduct more than nine years after the verdict was rendered. After several postconviction relief motions and appeals, the trial court held an evidentiary hearing on the defendant's juror misconduct claim. At the evidentiary hearing, the complaining juror testified and the trial court admitted the deposition testimony of nine jurors. See id. at 1255.[8]Cf. Ex parte Greenville News, 326 S.C. 1, 482 S.E.2d 556, 557 (1997) (noting that trial court permitted depositions of jurors relating to juror misconduct claim raised three years after conviction and death sentence were affirmed, founded on information received in anonymous phone call to defense counsel).
Although a direct appeal case, State v. Santiago, 245 Conn. 301, 715 A.2d 1 (1998), is worth noting since it also involved a juror misconduct claimed premised on racial slurs being made by a juror. In Santiago, the Connecticut Supreme Court concluded that in all future cases in which a defendant alleges that a juror has made racial epithets, the trial court should conduct, at a minimum, "an extensive inquiry of the person reporting the conduct, to include the context of the remarks, an interview with any persons likely to have been a witness to the alleged conduct, and the juror alleged to have made the remarks." Id. at 22. In a separate opinion, Chief Justice Callahan expressed the following concerns:
Postconviction allegations of juror misconduct require the court to strike a delicate balance between the competing interests of the state and the defendant. Obviously, allegations of juror misconduct must be taken seriously at any stage of the proceedings and inquiry is always warranted. [State v. Brown, 235 Conn. 502, 668 A.2d 1288, 1305 (1995) ]. "[A]fter a jury verdict has been accepted, [however] other state interests emerge that favor proceedings limited in form and scope." Id. Specifically, we have identified those compelling state interests to include preserving the "finality of judgments ... and in protecting the privacy and integrity of jury deliberations, preventing juror harassment and maintaining public confidence in the jury system." (Citations omitted.) Id. Certainly, there are circumstances in which these state interests must give way to the countervailing interest of the defendant. A defendant's right to a fair trial, an interest shared by the state, is one such interest. Our rule set forth in Brown, however, adequately addressed this concern. In Brown, we concluded that "[t]he more *1244 obviously serious and credible the allegations, the more extensive an inquiry is required; frivolous or incredible allegations may be disposed of summarily." Id. An allegation of racial bias is perhaps the most serious of juror misconduct allegations. Pursuant to the rule adopted in Brown, the trial court always will be obliged to conduct an inquiry. Moreover, in light of the seriousness of the allegation, the court must err on the side of caution in the thoroughness of the inquiry. Once the allegation is found to be frivolous or incredible, however, there is no compelling reason to engage in a full evidentiary hearing.
In many cases alleging juror misconduct based on racial bias, it would be reasonable to conclude that the trial court abused its discretion if it failed to inquire of the accused juror or others who might have heard the alleged racist remarks. Every case is unique, however, and must be viewed individually. It is for this reason that, in Brown, we left the form and scope of the inquiry to the discretion of the trial court. In light of all of the evidence presented in this case, the trial court's inquiry was adequate because the court found the source of the allegations unbelievable and thus did not abuse its discretion in halting the inquiry when it did. The majority opinion discounts any consideration of factors that weigh in favor of the state, and instead tips the balance wholly in favor of the defendant, irrespective of the unbelievability of the allegations or the harm that might result from an unnecessary recall of the jurors.
There is no doubt that when racism rears its ugly head, it must be dealt with swiftly and surely to avoid its invidious effect. It is equally true, however, that when allegations of racism are found to be false and unfounded after an inquiry, the trial court should deal with them forthwith, lest they dilute the significance of legitimate allegations. Moreover, the finality of judgments and the legitimate expectation of jurors that their deliberations will be private and that they will not unjustly be made to defend against baseless charges or have their integrity impugned, weigh in favor of not continuing the investigation when the source of the allegation is completely discredited by the trier of fact. To give credence to [the juror's] meritless allegations in this case by establishing a per se rule that arbitrarily mandates a full evidentiary inquiry into the most baseless of assertions demeans, rather than enhances, our notions of justice.
Id. at 26-27 (Callahan, C.J., concurring in part and dissenting in part) (some alterations in original). Further, as noted by the Appellate Court of Illinois:
While we are aware of the difficulties the jurors may face in attempting to recall events which occurred years ago, and while we are reluctant to again interrupt the jurors' lives and involve them in additional court proceedings, those considerations do not outweigh the need to insure that the parties received a trial untainted by bias or extraneous information.
Taylor v. R.D. Morgan & Associates, Ltd., 205 Ill.App.3d 682, 151 Ill.Dec. 80, 563 N.E.2d 1186, 1194 (1990).
Based upon the analysis set out above, we conclude that the trial court erred in summarily denying Marshall's juror misconduct claim.

Ineffective Assistance of Counsel
Marshall next argues that the trial court erred in denying his claim that trial counsel was ineffective for failing to adequately investigate, develop, and present available mitigating evidence regarding his family background and abusive childhood. *1245 Marshall contends that had such evidence been presented, there would have been a sufficient basis to support the jury's recommendation of life imprisonment.
In order to prove an ineffective assistance of counsel claim, a defendant must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216, 219-20 (Fla.1998). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693, 104 S.Ct. 2052. However, a defendant need not show that counsel's deficient performance "more likely than not altered the outcome in the case." Id. Rather, to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the Strickland test. See Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999) (citing Rose v. State, 675 So.2d 567, 571 (Fla. 1996)). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.
At the postconviction evidentiary hearing, Marshall called three of his brothers to testify, Brindley Marshall, Percival Marshall, Jr., and Marvin Marshall. Each of Marshall's brothers testified that their father was extremely abusive while they were growing up. In particular, Marshall's brothers testified that their father would beat them with extension cords, tree branches, and electrical wire.[9] Sometimes the beatings would last upward of thirty to forty-five minutes. In addition, Brindley and Percival each testified that their father would bind their hands and feet with duct tape, take off all of their clothes, and beat them. Brindley and Percival also testified that they, along with Marshall, would sometimes sleep in the toolshed in the backyard, on the roof of the health clinic behind their house, or at their aunt's house to avoid the abuse. They also indicated that their father abused alcohol. Marshall's brothers further testified that their father abused their mother, and allegedly stabbed her on one occasion. However, the brothers acknowledged that they did not call the police to report the abuse. All three brothers testified that they were not contacted by trial counsel. Brindley and Marvin were in prison at the time of trial.
Marshall also presented testimony from five of his cousins at the evidentiary hearing, *1246 Medwer Moultrie, Samuel Whymns, Lisa Laing Forbes, Jacqueline Laing, and Philencia Dames. Samuel Whymns, Lisa Laing Forbes, Jacqueline Laing, and Philencia Dames lived in the Bahamas, but testified that they visited and stayed at Marshall's home for varying amounts of time while growing up. Medwer Moultrie, on the other hand, testified that he lived with Marshall's family for two years at the request of his mother, who asked him to keep an eye on his aunt (Marshall's mother) because his uncle (Marshall's father) was being abusive. Marshall's cousins each testified in varying degrees as to the physical abuse Marshall and his mother suffered. All of Marshall's five cousins indicated that they were not contacted by trial counsel. Marshall's four cousins who lived in the Bahamas at the time of the trial also indicated that their relatives in Miami knew how to contact them.
This Court has held that "[a]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Rose, 675 So.2d at 571; see also State v. Riechmann, 777 So.2d 342, 350 (Fla.2000). This Court has also recognized that "[t]he failure to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rose, 675 So.2d at 571.
At the evidentiary hearing, trial counsel testified that he conducted a thorough interview with Marshall prior to trial during which he tried to obtain a life history. Trial counsel acknowledged that his notes from this interview indicated that Marshall did not want to involve his brothers and sisters, although trial counsel said he would have disregarded this request due to his duty to investigate. During this interview, Marshall told trial counsel that he completed tenth grade and started eleventh, that he was very fortunate to have two parents who motivated and encouraged him to succeed, and that there was "so much love" in his family. Marshall also denied being neglected or abused. Marshall described discipline at home as 75% verbal and 25% physical, although he did not characterize the physical discipline as abusive. Marshall did not relate any physical or mental health problems to trial counsel, and denied having suffered any serious head injuries. Defense counsel also indicated that he reviewed Marshall's school, prison, and mental health records.
In addition to speaking with Marshall, trial counsel indicated that he made efforts to speak with family members. Marshall provided trial counsel with his aunt's name, and trial counsel indicated that he wrote two letters to her requesting that she contact him because Marshall had indicated that she could put him in touch with Marshall's father and other relatives. Marshall's aunt never responded to trial counsel's inquiries. Trial counsel, however, did eventually speak with Marshall's father. According to trial counsel, Marshall's father indicated that Marshall had a good upbringing, although he and his brothers were always getting into trouble. Although trial counsel acknowledged that Marshall's father's comments about him having good grades were at odds with Marshall's school records, he indicated that he would not have made a different proffer by editing what the father would have said had he testified. Marshall's father also provided trial counsel with the names and ages of Marshall's brothers, but claimed not to know where they were living because he had disowned them due to their behavior. Trial counsel conceded during the evidentiary hearing that he did not file a motion for an investigator, nor did he request the assistance of either of the investigators working with the public defender's office at the time. Trial counsel *1247 explained that he would not have sent a female investigator into urban Dade County looking for witnesses because it would not have been safe. He also indicated that he would not have sent the other investigator, an elderly man, into Dade County either. Although trial counsel stated that he thought about driving into Liberty City himself, he chose not to do so. Trial counsel further explained that he had no information leading him to Liberty City. Trial counsel also testified that he would not have called Marshall's brother Brindley as a witness no matter what he had to offer, because he had previously tried to help Marshall escape. Trial counsel also noted that Marshall's father led him to believe that he was going to bring as many family members as possible with him to the penalty phase. Trial counsel acknowledged that had he possessed information concerning child abuse, he would have presented it at the penalty phase. However, trial counsel testified the problem in this case was that the information Marshall relayed to him coincided with what his father had said.
Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. However, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id. While trial counsel has a duty to investigate, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Id.; see also Rose v. State, 617 So.2d 291, 294-95 (Fla.1993) (trial counsel was not ineffective for failing to call family members where defendant told counsel that he had not had contact with his family for a number of years and that his family's testimony would not be helpful).
In Stewart v. State, 801 So.2d 59 (Fla. 2001), this Court rejected a claim that trial counsel was deficient for failing to investigate and present evidence of the defendant's alleged childhood abuse by his stepfather. As in this case, Stewart generally described a happy childhood and never informed defense counsel, or the defense psychiatrist, about any abuse he suffered. Further, trial counsel indicated that he personally interviewed Stewart's stepsisters, but neither mentioned that Stewart was abused. Similarly, Stewart's stepfather never led trial counsel to believe anything other than that he was a loving and caring father to Stewart. Accordingly, this Court concluded, "by failing to communicate to defense counsel (or the defense psychiatrist) regarding any instances of childhood abuse, [the appellant] may not now complain that trial counsel's failure to pursue such mitigation was unreasonable." Id. at 67 (citing Cherry v. State, 781 So.2d 1040, 1050 (Fla.2000)). Stewart would appear to dictate the same result in this case.
Marshall bears the burden of proving that trial counsel's representation was unreasonable under prevailing professional norms. See Cherry, 781 So.2d at 1048. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Moreover, "[t]here is `a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Asay v. State, 769 So.2d 974, 984 (Fla.2000) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. *1248 2052). As indicated above, trial counsel conducted a thorough pretrial interview of Marshall, who advised him that he was not abused as a child. Similarly, Marshall denied being abused when examined by Dr. Joel Klass, as well as when he was examined by one of the postconviction mental health experts (Dr. Woods). Marshall's version of his childhood was corroborated by his father, and trial counsel indicated that nothing in Marshall's prison or school records indicated abuse. Thus, it does not appear that the trial court erred in concluding that trial counsel conducted a reasonable investigation.

Ake Claim
Within his claim for ineffective assistance of counsel, Marshall also alleges that he was deprived of his right to an evaluation by a competent mental health expert pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This claim is procedurally barred because it could have been raised on direct appeal. See Cherry v. State, 781 So.2d 1040, 1047 (Fla.2000) ("[T]he claim of incompetent mental health evaluation is procedurally barred for failure to raise it on direct appeal.").
Moreover, Marshall contends that trial counsel was ineffective for failing to ensure a competent evaluation. The trial record reflects that trial counsel requested that a mental health expert be appointed to examine Marshall for competency and sanity, as well as for the existence of possible mitigating circumstances. The trial court granted this request and appointed Dr. Klass to conduct an examination of Marshall. Following Dr. Klass's examination, however, trial counsel filed a motion for the appointment of an additional mental health expert. Trial counsel's motion indicated that Dr. Klass apparently spent no more than one hour with Marshall and that, aside from two short letters, he had failed to communicate with trial counsel or inform counsel what tests, if any, were administered and what evidence might be gathered in mitigation. The trial court denied trial counsel's motion for an additional mental health expert, although it ordered Dr. Klass to comply with the court's original order of appointment and submit a written report to defense counsel.
Although there is no mention of whether trial counsel was able to secure Dr. Klass's compliance, we are not prepared to call trial counsel's performance deficient under the first prong of Strickland. Strickland, 466 U.S. at 687, 104 S.Ct. 2052 (stating that to prove counsel's performance was deficient defendant must show "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment"). After determining that Dr. Klass's evaluation was cursory, trial counsel filed a motion for an additional expert, which was denied by the trial court. Trial counsel cannot be deemed ineffective simply because he was unsuccessful in getting the trial court to appoint an additional expert. Moreover, trial counsel testified at the evidentiary hearing that he did not call Dr. Klass because "he would have been blown out of the water" when the jury learned that he only spent a short time with Marshall. This issue was adequately documented in the record and could have been raised on appeal.

Brady Claim
Marshall also argues that the trial court erred in denying his claim that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the State presented false testimony in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In particular, Marshall alleges that the *1249 State withheld evidence that inmates George Mendoza and David Marshall were promised to be housed together in the prison system in exchange for their testimony against Marshall.[10] Marshall contends that had the jury learned of this promise the credibility of Mendoza's testimony at trial would have been severely undermined. As such, Marshall argues that there is a reasonable probability that the jury would have found him not guilty, or guilty of a lesser offense than firstdegree murder.
To support this claim, Marshall called as witnesses at the postconviction evidentiary hearing inmates George Mendoza and David Marshall.[11] Mendoza and David Marshall both testified that they were promised by Inspectors Sobach and Riggins and Assistant State Attorney Spiller that they would be housed together in the prison system at an institution closer to home for their safety and protection in exchange for their testimony. According to Mendoza and David Marshall, the initial promise was made by investigator Riggins and later reiterated at a meeting following their grand jury testimony where Sobach, Riggins, and Spiller were present. Mendoza noted that they were informed their protection and safety were the reasons that they would continue to be housed together. Mendoza also indicated that Assistant State Attorney Spiller advised him that it was normal procedure in the courtroom to state that he was promised nothing in exchange for his testimony if asked by defense counsel. On cross-examination, however, both Mendoza and David Marshall acknowledged writing letters to Assistant State Attorney Spiller wherein they indicated that they understood no promises could be made. Mendoza and David Marshall also reiterated on cross-examination that their prior statements and testimony in the case were truthful.
Marshall also called Kerry Flack, formerly with the Department of Corrections, as a witness at the postconviction evidentiary hearing.[12] Flack testified that she became involved when inspector Sobach requested that she review files concerning Mendoza and David Marshall. According to Flack, Sobach indicated that Mendoza and David Marshall had been transferred to different institutions and he did not know whether or not they should have been permitted to remain at the same location. After reviewing the files and speaking with the classifications office and Inspector Sobach, Flack testified that she decided that "they had agreed that the inmates could move together in order to watch out for each other." Accordingly, she stated that she requested a transfer back to the same institution for Mendoza and David Marshall. Ms. Flack acknowledged at the evidentiary hearing upon viewing a print-out of the prison housing history for Mendoza and David Marshall that it was unusual for inmates to be *1250 transferred twice to the same location at the same time.
In rebuttal, the State called Inspectors Sobach and Riggins and Assistant State Attorney Spiller as witnesses during the postconviction evidentiary hearing. Sobach, Riggins, and Spiller each denied making or having any knowledge of any promises being made to Mendoza and David Marshall in exchange for their testimony. Sobach indicated that initial transfers of inmate witnesses are for their protection, but noted that any kind of commitment to keep two individuals together forever is "totally impracticable." He also indicated that he would not have the authority to keep Mendoza and David Marshall housed together. Inspector Riggins similarly testified that he did not have transfer authority. On cross-examination, Inspector Sobach acknowledged that it was kind of unique that Mendoza and David Marshall were able to stay together. However, he denied telling Kerry Flack that Mendoza and David Marshall were promised to be kept together. Rather, he testified that he contacted Flack because he was concerned as to whether or not the special review against Mendoza and David Marshall, causing their separation, was appropriate or whether it may have been retaliation of some sort.
Assistant State Attorney Spiller similarly testified that no promises were made to Mendoza and David Marshall in exchange for their testimony, although he and Inspector Riggins both acknowledged that Mendoza and David Marshall were reassured that everything possible would be done to protect them from retribution. Spiller stated that Mendoza and David Marshall on two occasions prior to trial requested that they be assured that they would be housed together. However, Spiller testified that he informed them on both occasions that he had no authority over housing and would not make any promises that could jeopardize the case. Although Spiller admitted writing a letter to the Department of Corrections denoting Mendoza's and David Marshall's cooperation in the case, he denied ever requesting that the department house the two inmates together. Lastly, Assistant State Attorney Spiller denied instructing Mendoza that it is normal procedure for witnesses to deny that promises were made in exchange for their testimony when asked at trial.
The trial court denied Marshall's claim, concluding that Marshall had failed to prove either a Brady or a Giglio violation. In so doing, the trial court noted that there was no knowing presentation of false testimony by the State since Mendoza himself acknowledged that he understood that the State could make no promises and had made no promises to induce his testimony. For the following reasons, it does not appear that the trial court erred in denying Marshall's Brady/Giglio claim.
The United States Supreme Court has recently provided the following threeprong analysis to be used when determining the merits of a Brady violation claim:
[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). With regard to the third prong, the Court emphasized that prejudice is measured by determining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, *1251 131 L.Ed.2d 490 (1995)). In applying these elements, the evidence must be considered in the context of the entire record. See State v. Riechmann, 777 So.2d 342, 362 (Fla.2000); Sireci v. State, 773 So.2d 34 (Fla.2000); Haliburton v. Singletary, 691 So.2d 466, 470 (Fla.1997).
In the instant case, it is questionable whether the State made a promise to house Mendoza and David Marshall together in exchange for their testimony. As noted above, Inspectors Sobach and Riggins, and Assistant State Attorney Spiller each denied making or having any knowledge of such a promise. Further, there is nothing in the record documenting the existence of any such promise. To the contrary, both Mendoza and David Marshall acknowledged at the postconviction evidentiary hearing that they wrote letters to Assistant State Attorney Spiller wherein they indicated that they understood no promises could be made. However, in light of the unique prison housing history of both inmates, it is conceivable that some sort of understanding may have been reached.
Nonetheless, even assuming the State withheld evidence of the alleged promise, Marshall does not appear to have satisfied the prejudice prong of the threepart test for a Brady violation. First, evidence of the alleged promise would have had limited impeachment value in this case. At trial, defense counsel thoroughly cross-examined Mendoza and, in doing so, elicited testimony concerning Mendoza's desire to remained housed with David Marshall and a letter Mendoza had written to inspector Riggins thanking him for stopping a transfer. The record reveals the following:
[Q]: Okay. You wrote Inspector Riggins a letter one time and asked or thanked him for stopping a transfer between you and your roommate?
[A]: No, for stopping a transfer for me going to Avon Park Correctional Institution.
[Q]: You didn'tyou andyou and your number twenty-eight [David Marshall] didn't want to be separated, did you?
[A]: I didn't want to leave the institution?
[Q]: You all were good friends, weren't you?
[A]: Yes sir.
More importantly, Mendoza was not the sole witness to testify at trial that he observed Marshall leaving the victim's cell, nor the only witness to describe the sounds heard coming from the victim's cell. To the contrary, former inmate Frank Calabria also testified in detail as to events he observed on the morning of the murder. In addition to describing the sounds he heard emanating from the victim's cell, Calabria testified that he observed Marshall exiting from the victim's cell with blood on his chest, arms, and hands. Furthermore, Calabria's testimony established that Marshall entered the victim's cell a second time, during which Calabria again heard moaning noises coming from the victim's cell. Thus, it does not appear that evidence of the alleged "promise" would have "put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936. See Rose v. State, 774 So.2d 629, 635 (Fla.2000) (finding no Brady violation due to limited impeachment value of any alleged deal given witnesses in exchange for their testimony and the fact that additional independent witnesses identified defendant as the perpetrator).
For similar reasons, it does not appear that the trial court erred in denying Marshall's Giglio claim. In order to establish a Giglio violation, a defendant must show that (1) the prosecutor or witness *1252 gave false testimony; (2) the prosecutor knew the testimony was false; and (3) the statement was material. See Rose, 774 So.2d at 635; Robinson v. State, 707 So.2d 688, 693 (Fla.1998); Routly v. State, 590 So.2d 397, 400 (Fla.1991). False testimony is material if there is a reasonable likelihood that it could have affected the jury's verdict. See Ventura v. State, 794 So.2d 553, 563 (Fla.2001); Rose, 774 So.2d at 635; Routly, 590 So.2d at 400. This Court has recognized that "[t]he thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury." Routly, 590 So.2d at 400 (quoting Smith v. Kemp, 715 F.2d 1459,1467 (11th Cir.1983)).
In the instant case, it is worth noting that Mendoza never expressly testified during Marshall's trial that no promises were made in exchange for his testimony. The trial transcript reveals the following:
[Q]: Okay. And you're justyou just got involved in this case becausewhy because you're looking for some favors like most snitches?
[A]: No sir, I got a life of a quarter mandatory. I can't get no favors as far as from that point. I just felt I was doing the right thing in coming forward and testifying to what I saw that morning.
....
[Q]: You're not looking for any reward you justjust a peaceful person.
[A]: Yes sir.
[Q]: That's why you werethat's why you got involved in this.
[A]: Yes sir.
Moreover, even assuming that the alleged promise was made, Marshall appears to have failed to satisfy the materiality prong of the three-part inquiry. As noted above, defense counsel impeached Mendoza during cross-examination regarding his desire to be housed with David Marshall and his letter thanking Inspector Riggins for stopping a transfer of him to another facility. Nor was Mendoza the sole witness to testify in regard to the events surrounding the murder. Thus, it appears that Marshall has failed to demonstrate a reasonable likelihood that the alleged false testimony could have affected the jury's verdict. See Ventura, 794 So.2d at 565 (holding evidence of deal immaterial under Giglio based on ample impeachment and corroboration).

Cumulative Error
Marshall argues that the trial court failed to conduct an adequate cumulative error analysis. As part of this claim, he alleges that "significant claims for which Mr. Marshall was denied an opportunity to present evidence" entitle him to relief. However, as explained in this opinion, we have rejected Marshall's claims of error on all issues but one, and have remanded for an evidentiary hearing on that claim. Hence, the claim of cumulative error has been rendered moot.

Summary Denial of Additional Issues
Finally, Marshall argues that the trial court erred in summarily denying twenty-two claims in his 3.850 motion without an evidentiary hearing. Except for claims (4), (15), and (25), Marshall presents no definitive argument on appeal, other than simply listing the issue raised below. Thus, these claims are insufficiently presented for review. See Shere v. State, 742 So.2d 215, 218 n. 6 (Fla.1999) (noting that issues raised in appellate brief that contain no argument are deemed abandoned). As to the three claims where Marshall does present arguments, they are either procedurally barred,[13] or they are not yet ripe *1253 for review.[14]

CONCLUSION
In accord with the above, we affirm the trial court's order denying postconviction relief, with the exception of the claims of juror misconduct. We remand for an evidentiary hearing on that claim. The scope of the hearing on remand is limited to attempting to obtain the identity of the female juror who spoke to Mr. Smith, to interview that juror, and then to conduct further interviews only if the court determines that there is a reasonable probability of juror misconduct. Moreover, the trial court may wish to conduct most or all of the questioning of the jurors, thereby ensuring that unnecessarily intrusive questions will not be asked of the jurors and to prevent questioning on matters that inhere in the verdict. Cf. People v. Hedgecock, 51 Cal.3d 395, 272 Cal.Rptr. 803, 795 P.2d 1260, 1274 (1990) (discussing steps trial court can take to avoid a chilling effect on jury deliberations when holding evidentiary hearing on juror misconduct claim).
It is so ordered.
ANSTEAD, C.J., and PARIENTE, J., and SHAW, Senior Justice, concur.
LEWIS, J., concurs in result only.
WELLS, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
WELLS, J., concurring in part and dissenting in part.
I concur with the majority opinion in respect to its denial of relief on issues two, three, four and five. I likewise concur that the affidavits of juror Pamela H. Bachman and Judy Cunningham set forth matters which inhere in the verdict and cannot be used to impeach the verdict.
However, I dissent from the decision of the majority to reverse the trial court and remand for an evidentiary hearing on the claim of alleged juror misconduct and for juror interviews based upon the affidavit of Ronald B. Smith. I believe the majority's decision and opinion on this issue seriously undermine the sanctity and security of the jury system. I do not believe that jurors who decided a case in 1989 should be subject to a 2003 interrogation based upon a 1996 affidavit which contains conclusory hearsay statements attributed to an anonymous caller.
The jury returned its verdict in this case in December 1989. Ronald Smith swore to his affidavit six and a half years later, on June 16, 1996. In his affidavit, Ronald Smith says in paragraph 1:
1. After the trial of Matthew Marshall, I received a telephone call from a woman who was calling in reference to a client of mine to whom she was related.
The affidavit does not (a) state when this call was made to Ronald Smith, and (b) does not identify the woman making the call.
In paragraph 2, the affidavit says:
She said some jurors told jokes about Matthew Marshall. She said the joking was racial.
The affidavit does not state what remarks "she said" were made. Obviously, what *1254 we have in this statement is conclusory hearsay within hearsay.
In paragraph 4, the affidavit says:
Then she said that some jurors did read articles about the trial and talked with each other about the articles they had read.
The affidavit does not state what was claimed to have been said in respect to any articles. Again, this statement is conclusory hearsay within hearsay.
Finally, the affidavit concludes that Ronald Smith cannot remember who the anonymous woman was.
Our jury system depends on citizens who serve on juries believing that their service will be secure and protected. This means that once that service is ended, the jurors will not be subject to unending interrogation about the decision made as jurors. I recognize that there must be room for exceptions when there is a substantial reason to believe that a jury has been the subject of an improper extraneous influence. But the standard for this exception must necessarily be high. Ronald Smith's affidavit does not even approach meeting that standard.
This is what this Court held in Baptist Hospital of Miami v. Maler, 579 So.2d 97 (Fla.1991), in determining that the affidavits in that case failed to state a legally sufficient reason to interview jurors:
We now clarify the meaning of [State v. Hamilton, 574 So.2d 124 (Fla.1991),] in light of the strong public policy against allowing litigants either to harass jurors or to upset a verdict by attempting to ascertain some improper motive underlying it. We hold that an inquiry is never permissible unless the moving party has made sworn factual allegations that, if true, would require a trial court to order a new trial using the standard adopted in Hamilton.

Id. at 100. In this case there are no sworn statements other than conclusory hearsay within hearsay.
In Devoney v. State, 717 So.2d 501, 504 (Fla.1998), this Court agreed with Justice O'Connor's observation in Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987):
Writing for a majority, Justice O'Connor observed the reality of the jury system when she commented:
There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time ... after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror misconduct.

Tanner, 483 U.S. at 120-21, 107 S.Ct. 2739 (citation omitted). We agree with Justice O'Connor's comments.
This Court then concluded in Devoney:
Imperfect as it may be, in a free country such as ours, the jury system continues to be the finest method ever devised for the resolution of disputes. To permit jury verdicts to be impugned in the manner advocated by Devoney would sow the seeds for the destruction of that system.
Id. at 505. What we held in Baptist Hospital and Devoney controls here, and this *1255 jury should not be impugned on the basis of such an affidavit as was here presented.
QUINCE, J., concurs.
NOTES
[1] The trial court found the following four aggravating circumstances: (1) the murder was committed by a person under sentence of imprisonment; (2) the defendant was previously convicted of violent felonies; (3) the murder was committed while the defendant was engaged in the commission of or an attempt to commit a burglary; and (4) the murder was especially heinous, atrocious, or cruel. In mitigation, the trial court found that the defendant's behavior at trial was acceptable and that the defendant entered prison at a young age. The trial court, however, specifically rejected as mitigation that the defendant's older brother influenced him and led him astray to run the streets and break the law, and that his mother caused him to believe he would suffer no negative consequences for his bad behavior. See id.
[2] These claims included: (1) public records are being withheld in violation of chapter 119, Florida Statutes; (2) the trial transcript is unreliable and incomplete; (3) ineffective assistance of counsel during the penalty phase; (4) Marshall was allowed to waive his right to present penalty phase evidence without an adequate record inquiry to determine whether the waiver was voluntary and intelligent; (5) the Florida Bar rules' prohibition against interviewing jurors is unconstitutional; (6) the trial court erred in permitting a state prison inmate to testify before the jury as an anonymous state witness; (7) the prosecutor prejudicially vouched for the credibility of state witnesses; (8) Marshall's death sentence rests upon an unconstitutional automatic aggravating circumstance; (9) Marshall was deprived of his right to a fair and impartial trial by jury; (10) the trial court improperly considered nonstatutory aggravation; (11) the State withheld exculpatory evidence or presented misleading evidence or both; (12) the trial court and Florida Supreme Court improperly failed to evaluate mitigating circumstances; (13) ineffective assistance of counsel during the penalty phase; (14) the jury instructions improperly shifted the burden to Marshall to prove that a life sentence was appropriate; (15) the jury override resulted in an arbitrary, capricious, and unreliable death sentence; (16) trial counsel was rendered ineffective during voir dire by the trial court's action when it refused to permit more people to participate in the venire; (17) trial counsel failed to obtain a competent mental health expert; (18) Marshall is innocent of first-degree murder; (19) Marshall's sentence was based upon unconstitutionally obtained prior convictions; (20) Florida's capital sentencing scheme is unconstitutional; (21) the trial court's failure to grant a change of venue deprived Marshall of a fair trial; (22) Marshall was improperly shackled during his trial and penalty phase; (23) Marshall's trial was fraught with procedural and substantive errors which cannot be harmless; (24) charging Marshall with both premeditated and felony murder violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (25) Marshall is insane to be executed; (26) Marshall is being denied his right to effective postconviction counsel due to a lack of funding; (27) newly discovered evidence establishes that execution by electrocution is cruel or unusual punishment.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] The woman purportedly called Mr. Smith in reference to one of his clients, to whom she was related.
[5] Section 90.607(2)(b) provides:

(b) Upon an inquiry into the validity of a verdict or indictment, a juror is not competent to testify as to any matter which essentially inheres in the verdict or indictment.
[6] Following a jury trial, one of the jurors in Powell contacted the plaintiffs' attorney and the trial judge to inform them that other members of the jury had made numerous racial jokes and statements about the plaintiffs throughout the trial proceedings and jury deliberations. See id. at 355. Based upon this disclosure, the plaintiffs requested a new trial or, alternatively, an interview of the entire jury panel. The trial court held an incourt interview of the juror, during which the juror testified that various jurors made racial remarks and jokes and she believed the verdict was the result of racial bias. The trial court denied both motions. On appeal, the Fifth District initially reversed and directed that further juror interviews be conducted, and if the trial court concluded that racial statements were made that a new trial be ordered. On rehearing, however, the Fifth District reversed itself. See id.
[7] This Court also found the alleged conduct, if established, to be violative of the guarantees of both the federal and state constitutions which ensure all litigants a fair and impartial jury and equal protection of the law. See id. at 358.
[8] At a previous evidentiary hearing, the trial court apparently permitted the jurors to be deposed by written interrogatories. See id.
[9] Marvin Marshall did not testify that he was beaten, although he stated that his father abused his brothers.
[10] David Marshall did not testify at Marshall's trial.
[11] Marshall also attached to his postconviction motion a copy of a civil rights action Mendoza filed against numerous correctional officials, in which Mendoza reiterated that an "oral contract/agreement" was made to house him and David Marshall together for their protection at an institution close to home for being State witnesses in Matthew Marshall's case.
[12] Prior to being the director of information, communications and legislative planning for the Department of Corrections, Flack was the assistant to the secretary. She indicated that her job entailed primarily dealing with complaints registered by inmates and inmates' families, and legislative inquiries from the media, the public, and other state agencies.
[13] Marshall's claim that he was allowed to waive his right to present penalty phase evidence without an adequate record inquiry to determine whether the waiver was voluntary and intelligent is procedurally barred because it could have been raised on direct appeal. Marshall's claim that the jury override resulted in an arbitrary, capricious, and unreliable death sentence was addressed on direct appeal. Marshall v. State, 604 So.2d 799 (Fla. 1992).
[14] Marshall concedes that the issue of his sanity to be executed is not ripe for consideration. See Fla. R.Crim. P. 3.811.